IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on May 7, 2019

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| v. | : | **VIOLATIONS:** |
| | : | |
| **CHENG BO, a/k/a JOE CHENG,** | : | 18 U.S.C. § 371 |
| | : | (Conspiracy to Defraud the United States |
| | : | and to Violate the International |
| | : | Emergency Economic Powers Act) |
| | : | |
| | : | 18 U.S.C. § 1956(h) (Money Laundering |
| | : | Conspiracy) |
| | : | |
| | : | **FORFEITURE:** |
| | : | 18 U.S.C. § 981(a)(1)(C) |
| | : | 18 U.S.C. § 982(a)(1) |
| | : | 18 U.S.C. § 853(p) |
| **Defendant.** | : | 18 U.S.C. § 2461(c) |
| | : | |

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1. Defendant CHENG BO, a/k/a JOE CHENG ("CHENG"), was a Chinese national who resided in China. CHENG was employed as a sales account manager by Company C-1, which was based in Singapore and conducted business in Hong Kong, China, and elsewhere. Company C-1 was a subsidiary of a United States business organization that was a global distributor of

electronic components and related software. Company C-1 was the parent company of dozens of subsidiaries in the Asia-Pacific region. Company C-1 functioned as a third-party link between electronics manufacturers and end users, such as equipment manufacturers.

2. Company C-2 was a business organization incorporated in Hong Kong. Company C-2 operated as a trading company that caused U.S.-origin goods to be exported from Hong Kong to China. CHENG was an owner and director of Company C-2 while he was employed as a sales representative by Company C-1. CHENG enrolled Company C-2 as a customer of Company C-1 in 2008, without disclosing his ownership interest. Company C-2 maintained U.S. dollar accounts at financial institutions, including Bank 1 in China.

3. Companies C-3 and C-4 were trading companies located in Hong Kong, with head offices and major business located in China. Companies C-3 and C-4 exported goods from Hong Kong to China.

4. Company C-5 was a business organization located in Shenzhen, China. Company C-5 was closely connected to Companies C-3 and C-4 through common ownership and shared addresses and phone numbers.

5. Companies C-6 and C-7 were trading companies located in Hong Kong.

6. U.S. Company 1 was a microelectronics manufacturer located in the United States.

7. The United States Department of Commerce ("DOC"), Bureau of Industry and Security, administers and enforces export controls, and requires export licenses for certain transactions as further described herein. The DOC was located in the District of Columbia.

## Relevant Legal Provisions

### The International Emergency Economic Powers Act

8.  Pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 – 1707, the President of the United States has the authority to deal with unusual and extraordinary threats to the national security, foreign policy and economy of the United States. Under IEEPA, the President may declare a national emergency through Executive Orders that had the full force and effect of law.

9.  IEEPA also empowers the DOC to issue regulations governing exports. Initially, the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 4601-4623, regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the DOC promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contain additional restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730.02. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided to the President under IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the EAA. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present. *See, e.g.,* 84 Fed. Reg. 41,881 (Aug. 15, 2019). Under IEEPA, it is a crime to willfully violate any regulation promulgated thereunder, including the EAR. *See* 50 U.S.C. § 1705.

10. Pursuant to its authority derived from IEEPA, the DOC reviewed and controlled

3

the export of certain goods and technology from the United States to foreign countries. In particular, the DOC placed restrictions on the export of goods and technology that it determined could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Under IEEPA and the EAR, it was a crime to willfully export, or attempt or conspire to export, from the United States any item listed on the Commerce Control List ("CCL") requiring an export license without first obtaining an export license from the DOC. *See* 50 U.S.C. § 1705(c); 15 C.F.R. § 764.2.

### The Wassenaar Arrangement

11. The Wassenaar Arrangement ("WA") is an international multilateral export control regime consisting of 42 countries that was established in 1996 and is the successor to the Cold War-era Coordinating Committee for Multilateral Export Controls ("COCOM"). The WA was established by its member countries, including the United States, to contribute to regional and international security and stability, by promoting transparency and greater responsibility in transfers of conventional arms and dual-use goods and technologies. Participating countries establish their own laws, regulations, and policies, to ensure that transfers of conventional arms and dual-use goods and technologies do not contribute to the development or enhancement of military capabilities which undermine these goals, and are not diverted to support such capabilities. Representatives of participating countries meet regularly in Vienna, Austria to discuss which military and dual-use items should be added or removed from the WA's List of Dual-Use Goods and Technologies and the Munitions List. Member countries then generally model their national export control lists after the Wassenaar control lists to regulate the export of items agreed to by the member countries.

## The Conspiracy

12. Between at least in or about 2011 and in or about 2015, in the District of Columbia, and elsewhere, CHENG, did knowingly and willfully combine, conspire, confederate, and agree, with numerous persons, including Companies C-2, C-3, and C-4, and other individuals and companies known and unknown to the Grand Jury, to commit offenses against the United States, and to defraud the United States, more particularly by:

    a. defrauding the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the DOC in the ascertainment and collection of customs and export information, the authority to inspect and examine cargo crossing the United States border, and the issuance of appropriate licenses that relate to the transfer of goods across the United States border, in violation of Title 18, United States Code, Section 371, through deceitful and dishonest means; and

    b. knowingly and intentionally committing an offense against the United States, specifically by knowingly and willfully exporting and causing to be exported from the United States to China export-controlled power amplifiers, without obtaining the required licenses or other written authorization from the DOC, causing violations of, and conspiring to violate, the regulations governing trade and exports from the United States to China, in violation of 50 United States Code, Section 1705(c), 15 Code of Federal Regulations, Sections 742.4 and 764.2, all in violation of 18 United States Code, Section 371.

## Goals of the Conspiracy

13. The goals of the conspiracy by CHENG and his co-conspirators were as follows:

    a. to continue to purchase controlled U.S. goods for shipment to China without the required licenses from the DOC;

b.  to continue to receive financial profits and other benefits of the purchase of controlled U.S. goods for shipment to China without the required licenses from the DOC;

c.  to conceal from U.S. persons and mislead the U.S. government, including the DOC, regarding the end user, use, and destination of controlled U.S. goods shipped to China without the required licenses from the DOC; and

d.  to evade and cause others to evade or violate the regulations, prohibitions, and licensing requirements of IEEPA and the EAR.

### **Manner and Means of the Conspiracy and Scheme to Defraud**

14.  It was part of the conspiracy and scheme to defraud that CHENG and certain of his co-conspirators used trading Company C-2 in Hong Kong for the purpose of obtaining goods from the United States for export to China via Hong Kong.

15.  It was further part of the conspiracy and scheme to defraud that, in CHENG's employment with Company C-1, he operated as a sales representative to Company C-2 (with whom CHENG had an ownership interst) and advanced Company C-2's efforts to purchase goods from Company C-1.

16.  It was further part of the conspiracy and scheme to defraud that CHENG and certain of his co-conspirators submitted purchase orders on behalf of Company C-2 to Company C-1, to purchase controlled U.S. goods manufactured by U.S. Company 1. These controlled U.S. goods included power amplifiers that required a license from the DOC for any export or re-export to China.

17.  It was further part of the conspiracy and scheme to defraud that CHENG and certain of his co-conspirators falsely represented to Company C-1 and U.S. Company 1 that the goods would be used by Company C-2 in Hong Kong. CHENG and certain of his co-conspirators knew

that in fact the goods would be shipped from Hong Kong to China without obtaining a license from the DOC and in violation of U.S. law.

18. It was further part of the conspiracy and scheme to defraud that CHENG and certain of his co-conspirators did not apply for or otherwise seek a license from the DOC to cause the shipment of the controlled U.S. goods to China.

19. It was further part of the conspiracy and scheme to defraud that CHENG and certain of his co-conspirators arranged that CHENG would receive payment for Company C-2's orders of the controlled power amplifiers from Companies C-3 and C-4, trading companies that functioned to ship goods from Hong Kong to China.

20. It was further part of the conspiracy and scheme to defraud that CHENG and certain of his co-conspirators caused payment in U.S. dollars to be sent to U.S. Company 1 by Company C-1 to pay for the purchase of the controlled U.S. goods.

21. It was further part of the conspiracy and scheme to defraud that CHENG and certain of his co-conspirators caused end user information to be provided to U.S. Company 1 by falsely stating that the controlled U.S. goods would be used for in Hong Kong. This false information caused U.S. Company 1 to file false electronic export information in the United States.

### Overt Acts

22. On or about the dates listed below, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, CHENG, Companies C-2, C-3, and C-4, and others known and unknown to the Grand Jury, committed or caused to be commited, in the District of Columbia and elsewhere, the following overt acts.

23. On or about March 7, 2011, CHENG, on behalf of Company C-2, requested to purchase controlled power amplifiers from U.S. Company 1 through Company C-1.

24. On or about February 18, 2013, CHENG, on behalf of Company C-2, sent a purchase order to Company C-1 for 300 export-controlled power amplifiers.

25. On or about February 20, 2013, CHENG emailed an end user statement to Company C-1 dated January 31, 2013, listing Company C-2 as the end user at a residential address in Hong Kong.

26. On or about February 20, 2013, CHENG, via Company C-2's Bank 1 account, received a $3,500 deposit from Company C-3.

27. On or about February 24, 2013, in response to an order CHENG placed with Company C-1 for controlled power amplifiers, and at the request of a Company C-1 employee, CHENG emailed the Shipping/Licensing group at Company C-1 a copy of the business registration for Company C-2, as well as an end user statement for the order.

28. On or about February 24-25, 2013, CHENG assured an employee of Company C-1 that the goods sought by Company C-2 would be used for assembly in Hong Kong and would not be re-exported to China.

29. On or about April 5, 2013, U.S. Company 1 exported 300 controlled power amplifiers valued at $12,390 to Company C-1 in fulfillment of Company C-2's order.

30. On or about April 6, 2013, based on false representations by CHENG, U.S. Company 1 filed electronic export information in the United States that falsely indicated that the end user of the 300 controlled power amplifiers was located in Hong Kong and that, therefore, no export license was required.

31. On or about April 15, 2013, CHENG, via Company C-2's Bank 1 account, received an $11,520 deposit from Company C-3, representing the final payment for this order.

32. On or about April 15, 2013, Company C-6 paid Company C-1 for Company C-2's

8

order of power amplifiers from Company C-1 that had been sourced from U.S. Company 1.

33. On or about April 22, 2014, CHENG submitted an order to Company C-1 on behalf of his Company C-2 for the purchase of 270 controlled power amplifiers from U.S. Company 1. In this submission, CHENG falsely represented that the end user of the power amplifiers was Company C-2, located in Hong Kong.

34. On or about April 24, 2014, Company C-1 confirmed the order with CHENG and, five days later, placed the order for the 270 controlled power amplifiers with U.S. Company 1.

35. On or about May 28, 2014, U.S. Company 1 exported the controlled power amplifiers from the United States to Company C-1, which had placed CHENG's order on behalf of Company C-2, which he falsely represented was the end user located in Hong Kong.

36. On or about May 28, 2014, based on false representations by CHENG, U.S. Company 1 filed electronic export information in the United States that falsely indicated that the end user of the 270 controlled power amplifiers was located in Hong Kong and that, therefore, no export license was required.

37. On or about June 24, 2014, after Company C-1 issued an invoice to Company C-2 for approximately $73,170 for the 270 controlled power amplifiers, Company C-2 wired $60,000 to Company C-1 from the Bank 1 account located in China as partial payment for the controlled power amplifiers.

38. On or about November 4, 2014, CHENG submitted an order to Company C-1 on behalf of Company C-2 for the purchase of 500 controlled power amplifiers from U.S. Company 1. In this communication, CHENG falsely represented that the end user of the power amplifiers was Company C-2, located in Hong Kong, when he knew the end user was in China.

39. On or about November 12, 2014, CHENG emailed Company C-1 employees an end-user statement falsely indicating, among other things, that the end-user was Company C-2 located in Hong Kong.

40. On November 26, 2014, U.S. Company 1 exported the 500 controlled power amplifiers from the United States to Company C-1, which had placed CHENG's order on behalf of Company C-2, which CHENG had falsely represented was the end user located in Hong Kong.

41. On or about November 26, 2014, based on representations made by CHENG, Company C-1 filed electronic export information in the United States that falsely indicated that the end user of the 500 controlled power amplifiers was located in Hong Kong and that, therefore, no export license was required.

42. Between on or about October 15 and December 11, 2014, Company C-2 used the Bank 1 account located in China to make three wire transfers to Company C-1, totaling approximately $89,145 for the order of the 500 controlled power amplifiers.

43. On or about December 9, 2014, Company C-4 paid Company C-2 $91,243.90 for this order.

44. On or about November 20, 2014, CHENG sent an email to Company C-1 ordering 200 controlled power amplifiers on behalf of Company C-2.

45. On or about December 4, 2014, CHENG sent an email to two Company C-1 employees and falsely indicated that the end user for the order of 200 controlled power amplifiers was Company C-2 in Hong Kong.

46. On or about December 10, 2014, CHENG, via the Bank 1 account, received a $6,140 deposit from Company C-3 as partial payment for this transaction.

47. On or about December 30, 2014, based on representations by CHENG, Company

C-1 filed electronic export information in the United States that falsely indicated that the end user of the 200 controlled power amplifiers was located in Hong Kong and that, therefore, no export license was required.

48. On or about December 30, 2014, U.S. Company 1 exported the 200 controlled power amplifiers from the United States to Company C-1, which had placed CHENG's order on behalf of Company C-2, which CHENG had falsely represented was the end user located in Hong Kong.

49. On or about January 13, 2015, CHENG, via Company C-2's Bank 1 account in China, received a $36,360 deposit from Company C-4. A separate bank payment record in English corresponding to this order indicated the address associated with Company C-2 was located in China.

50. On or about January 16, 2015, the items purchased by Company C-2 were received in Hong Kong by Company C-6. Company C-7 took possession of the items on or around January 17, 2015. Commercial paperwork obtained by Company C-7 in connection with the transaction stated that the items were to be shipped to Company C-3.

51. On or about January 27, 2015, CHENG sent an email to an employee at Company C-1 attaching a purchase order from Company C-2 for 30 controlled power amplifiers dated January 16, 2015.

52. On or about March 2, 2015, CHENG placed another order with Company C-1 on behalf of Company C-2 for 100 controlled power amplifiers from U.S. Company 1.

53. On or about March 3, 2015, CHENG sent an email to an employee at Company C-1 and others, requesting approval for this "repeat order."

54. On or about March 12, 2015, CHENG requested that an employee at Company C-1 check on the status of pending shipments of controlled power amplifiers to Company C-2. On or

about March 12, 2015, the employee at Company C-1 sent an email to an employee at U.S. Company 1 and requested the employee to review pending orders for Company C-2, and she requested to know when U.S. Company 1 would be allowed to release the hold on the "export controlled parts." On or about March 13, 2015, the employee at U.S. Company 1 sent an email stating that the order was on hold as the items required a license for export to China.

55. On or about March 13, 2015, an employee at U.S. Company 1 sent an email to an employee at Company C-1 and asked if the controlled power amplifiers were being manufactured by Company C-2 in Hong Kong or whether they would be shipped to another destination. The employee at Company C-1 sent an email to CHENG and asked CHENG to confirm whether the controlled power amplifiers would remain in Hong Kong or be shipped to China. CHENG responded to the Company C-1 employee and indicated that the controlled power amplifiers were repeat orders, and the end product was "being manufactured in Hong Kong." Based on this information provided by CHENG, the Company C-1 employee sent an email March 18, 2015, to the employee at U.S. Company 1 and confirmed that the parts would be used in Hong Kong by Company C-2. Based on CHENG's representation through Company C-1 to U.S. Company 1, the U.S. Company 1 employee released the order of controlled power amplifiers as eligible for export to Hong Kong under an applicable exception to the U.S. licensing requirements, one that would not have been available if the items were destined for China.

56. On or about March 18, 2015, U.S. Company 1 exported from the United States to Company C-1 in Hong Kong all 130 controlled power amplifiers, which were valued at approximately $24,590.

57. CHENG caused U.S. Company 1 to file false electronic export information in the United States on or about March 18, 2015, indicating the end user for the 130 controlled power

amplifiers was in Hong Kong and that a license exception applied that would otherwise not have been available if the items were destined for China.

58. On or about March 25, 2015, CHENG, via Company C-2's Bank 1 account, received a deposit of approximately $18,180 and $1,640 from Company C-4, representing the final deposit for this transaction.

59. On or about March 26, 2015, a corresponding withdrawal of approximately $17,700 is reflected in Company C-2's records as having been obtained from Company C-2's Bank 1 account.

60. In or around June 2015, CHENG deleted the stored data on his work-issued laptop computer before returning it to Company C-1 in connection with his resignation from Company C-1.

## FAILURE TO OBTAIN A LICENSE

61. The DOC has issued certified license determinations declaring that, throughout the time period relevant to this Indictment, the U.S. power amplifiers purchased by Company C-2 from Company C-1 were controlled for National Security and Anti-Terrorism reasons, and required a license for export from the United States to China. At all times relevant to this Indictment, the export-controlled power amplifiers were designated on the WA's List of Dual-Use Goods and Technologies. At no time did anyone apply for or obtain a required export license from the DOC for the transactions above.

All in violation of Title 18, United States Code, Section 371.

**(Conspiracy to Violate IEEPA and to Defraud the United States, in violation of Title 18, United States Code, Section 371)**

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

62. The allegations in Paragraphs 1 through 61 of this Indictment are incorporated and re-alleged by reference herein.

63. Between at least in or about 2011 and in or about 2015, in the District of Columbia and elsewhere, CHENG did knowingly combine, conspire, confederate, and agree together and with other persons both known and unknown to the Grand Jury, to transmit or transfer funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, with the intent to promote violations of IEEPA, 50 U.S.C. § 1705, in violation of Title 18, United States Code, Section 1956(h).

**(Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h))**

### FORFEITURE ALLEGATION

64. Upon conviction for the offense alleged in Count One, CHENG shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission to the offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

65. Upon conviction for the offense alleged in Count Two, CHENG shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission to the offense,

including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

66. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

**(Criminal Forfeiture, pursuant to Title 18, United States Code Sections 981(a)(1)(c) and 982(a)(1), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

A TRUE BILL

FOREPERSON

*Jessie K. Liu /dc*
Attorney of the United States in
and for the District of Columbia

15